**ALTMAN CAMERA CO., INC.,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 73–2121.**

United States Court of Appeals,
Seventh Circuit.

Heard Nov. 19, 1974.
Decided Feb. 26, 1975.

Lester Asher and Stephen B. Rubin, Chicago, Ill., for intervenor.

Arthur B. Muchin, Chicago, Ill., for petitioner.

Elliott Moore and Joseph E. Mayer, N.L.R.B., Washington, D. C., for respondent.

Before SWYGERT and CUMMINGS, Circuit Judges, and WYZANSKI, Senior District Judge.[*]

CUMMINGS, Circuit Judge.

Altman Camera Co., Inc. has petitioned us to review and set aside an order requiring the Company to bargain with the Union[1] and to cease and desist from unfair labor practices. The Board has cross-applied for enforcement of its order. The Board's decision and order are reported in 207 NLRB No. 143.

The Company operates a retail photographic equipment store in downtown Chicago. It sells merchandise to customers over the counter and by mail order. During the relevant period, the Company employed 67 persons in selling and related jobs.

In late August 1971, five Company employees discussed the possibility of representation by the Union. On August 26, they spoke to Union Representative Bonnie Cummings about organizing the store. Cummings suggested that the employees should be asked to sign authorization cards designating the Union as their bargaining representative. He gave these employees authorization cards to be signed by their co-workers.

On August 31, the same five employees organized a meeting of their associates and urged them to sign the authorization cards. Two days later, the employees were addressed by Cummings and two other union officials.

At a meeting on September 9, Cummings explained the purpose of the authorization cards was for proof of a majority in order to obtain voluntary recognition by the Company or otherwise to support a petition for an election. By that date, the Union had obtained 41 signed authorization cards from the 67 employees in this bargaining unit. Thirty-four cards were needed for a majority.

On September 9, the Union filed an unfair labor practice charge with the Board alleging that the Company had violated Section 8(a)(3) and (1) of the Act by discharging employee Walter Mueller because of his union activities. On the next day, the Union requested the Company to recognize it as the sales employees' bargaining unit's exclusive bargaining representative. Upon the Company's refusal, on September 10 the Union filed a petition for a representation election, and an election was scheduled to be conducted on November 4.

On October 26 and November 1, the Union filed additional charges with the Board alleging that the Company had engaged in unlawful surveillance, had threatened its employees with reprisals for their union activities and had unlawfully refused to recognize and bargain with the Union, in violation of Section 8(a)(1) and (5) of the Act. On November 2, the Board's Regional Director canceled the November 4 election pending investigation of the Union's charges. On or about November 6, four company employees circulated an anti-union petition

---

[*] Senior District Judge Charles E. Wyzanski, Jr. of the District of Massachusetts is sitting by designation.

[1]. Warehouse and Mail Order Employees Union, Local No. 743, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. On May 24, 1974, this Court granted the Union's motion to intervene, and the Union filed a brief and participated in the oral argument.

among the Company's employees, and 48 of them signed the petition.

Both the administrative law judge and the Board decided that the Company had not discriminatorily discharged employee Walter Mueller in violation of Section 8(a)(3) and (1) of the Act. However, both found that the Company had violated Section 8(a)(1) of the Act by interrogating its employees concerning their union sympathies, by promising them benefits for refraining from such activities, and by threatening them with loss of benefits and possible loss of jobs if the Union became their collective bargaining representative. Unlike the administrative law judge, the Board also found that the Company violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the Union and concluded that a bargaining order was the appropriate remedy for the unfair labor practices found. Consequently, the order of the Board requires the Company to cease and desist from unfair labor practices and to bargain with the Union as well as to post appropriate notices.

*Section 8(a)(1) Violations*

██ We have reviewed the findings of the administrative law judge and are satisfied that in the relevant period Supervisors Winkler and Emas coercively interrogated six employees about the union movement. The administrative law judge was also justified in finding that each of the six and four additional employees were subjected to threats or inducements by those supervisors and Supervisor Ross. Promises of benefits were also made to five employees by Emas and Ross. Since there was no specific repudiation by the Company of these supervisors' conduct, it was responsible for these acts of its agents. National Labor Relations Board v. Urban Telephone Corporation, 499 F.2d 239, 243–244 (7th Cir. 1974); National Labor

Relations Board v. Drives, Incorporated, 440 F.2d 354, 363 (7th Cir. 1971); National Labor Relations Board v. Kaiser Agricultural Chemicals, 473 F.2d 374, 384 (5th Cir. 1973). Even if President Ralph Altman had instructed his managers as to what was acceptable anti-union action, the Company had to assume the risk that some supervisors would improperly conduct the anti-union campaign. Hendrix Mfg. Co., Inc. v. National Labor Relations Board, 321 F.2d 100, 104 (5th Cir. 1963). The situation would have been different if Mr. Altman had apprised the employees of instructions to his supervisors not to make promises or threaten the employees or had repudiated his supervisors' improper conduct. Instead, Altman's two speeches to his employees stating that he intended to correct his past mistakes, although not found to constitute unfair labor practices, buttressed his supervisors' prophecies of better working conditions, so that the Company was correctly held responsible for its supervisors' misconduct. See Section 2(13) of the National Labor Relations Act (29 U.S.C. § 152(13)).

*Majority Support of Union*

The administrative law judge and the Board upheld the validity of 37 of the 41 authorization cards submitted from the 67-employee unit.[2] The Company contends that there was no violation of Section 8(a)(5) of the Act because twelve of these 37 cards were improperly solicited and, therefore, the Union lacked a majority of valid cards.

██ As to ten of the twelve employees (Gulati, Erlien, Abrams, Schmidt, Markiewicz, Vohra, Garrison, Goldblatt, Keister and Narea), it was permissible on this record for the Board to find that they were not told that the card was to be used solely for the purpose of obtaining an election or only for informational purposes or as not obligating them to the

**2.** Since Mueller was discharged before the Union made a recognition demand, his card was not considered valid in the computations of the administrative law judge or the Board. The Board also found it unnecessary to pass upon the General Counsel's contention that

the administrative law judge erroneously invalidated the cards signed by employees Kudlick, Hilliard and Moy because the 37 cards validated by the administrative law judge constituted a majority of the unit.

Union. Since the cards unambiguously stated that signers were authorizing the Union "to act as * * * [their] collective bargaining agent" and the Company did not show that the card's plain language was "deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature" (National Labor Relations Board v. Gissel Packing Co., 395 U.S. 575, 606, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547), the cards were properly counted.

■ As to employee Lurey, before signing his card he attended a union meeting where the employees were told that dues and initiation fees would not commence until the Union signed a collective bargaining agreement with the Company. This was not an improper inducement of Lurey. National Labor Relations Board v. Savair Mfg. Co., 414 U.S. 270, 272–274, n. 4, 94 S.Ct. 495, 38 L.Ed.2d 495. The refusal of the administrative law judge and the Board to credit the Company's contention that Lurey was promised perpetual freedom from dues was permissible on the record, especially since the card itself stated, "NO DUES payable *until a contract is signed* * * *" (emphasis added). The Company's Cross-Exception 25 to the findings of the administrative law judge is sufficient to raise this question before the Board; consequently, we do not rely on the waiver provision of Section 10(e) of the Act, as urged by the Board's brief.

■ Finally, as to employee Morgan, the Company asserts that it was error to count his card because he allegedly would not have turned it in except for the pressure placed upon employees by union representatives at a meeting to turn their cards in before they adjourned. Since Morgan attended all the meetings where the alternative uses of the cards were discussed, the decision of the administrative law judge, as adopted by the Board, that Morgan's card was validly executed is supported by substantial evidence in the record. As in the case of Lurey's card, we do not accept the invitation of counsel for the Board to rely on Section 10(e) to uphold the validity of Morgan's card.

For these reasons, the Board was entitled to count the twelve cards challenged by the Company, so that the Union possessed a majority of valid authorization cards on September 10 when it unsuccessfully requested the Company to recognize and bargain with it.

*Appropriateness of Bargaining Order*

■ Relying primarily upon our decision in Peerless of America, Inc. v. National Labor Relations Board, 484 F.2d 1108 (7th Cir. 1973),[3] the Company urges that the bargaining order was inappropriate. However, the tests established in National Labor Relations Board v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, have been satisfied. There the Court indicated that a bargaining order would be appropriate where the employer's unfair practices are so pervasive and coercive that it is the only effective means of remedying them or where less substantial unfair labor practices only permit a slight chance of a fair election.

As the Board found, the Company had embarked upon a course of "flagrantly coercive conduct" through the anti-union campaign of Supervisors Winkler, Emas and Ross, so that it was unlikely that an election would produce more reliable results for employees than the cards they had signed. National Labor Relations Board v. Kostel Corporation, 440 F.2d 347, 353 (7th Cir. 1971).

The administrative law judge conceded that "This case is a classic one for a *Gissel*-type remedy [bargaining order]." He refused to recommend such a remedy because some of the pro-union employees had left the Company's employ, others were disenchanted by the union representatives' manner and tactics, and because employee Moy testified that em-

**3.** See also National Labor Relations Board v. Gruber's Super Market, Inc., 501 F.2d 697 (7th Cir. 1974).

ployees were fearful that the Union was trying to avoid a secret ballot. However, the anti-union petition was not signed by the 48 employees until two days after the previously set election date of November 4th. The election had been postponed on November 2 by the Regional Director because of the Company's alleged unfair labor practices so that, he thought, the holding of a fair election would be impossible. The administrative law judge, the Board and this Court subsequently sustained the charges of serious unfair labor practices. In such a context, the anti-union petition does not denigrate from the propriety of a bargaining order. Similarly, the largely subjective factors relied on by the administrative law judge are overborne by the reasonable inferences drawn by the Board as to the impact of the Company's unfair labor practices.[4]

Unlike *Peerless, supra,* these unfair labor practices could not be deemed marginal. They arguably succeeded in luring employees from their September 10 pro-union stand. *Gruber's Super Market, Inc., supra,* n. 2, is likewise distinguishable. In that case there was no anti-union animus, nor had Gruber's conduct resulted in its employees' losing interest in the Union.

The Board's order will be enforced in its entirety.

---

4. The Board applied the analysis required by *Gissel* in deciding to overturn the finding of the administrative law judge that the loss of support was not caused by the Company's pervasive unfair labor practices. The Board, while rejecting the subjective approach to the question employed by the administrative law judge, indicated that there was substantial evidence even under such an analysis that the Company's misconduct had undermined union support to an extent where an election would not be reliable in determining the employees' wishes. The Board said:

"As found above, Respondent on September 10 wrongfully refused to recognize and bargain with the Union and thereupon embarked upon a course of flagrantly coercive conduct designed to dissipate and undermine the Union's majority. In view of this finding, which is based on the objective test set forth in *Gissel Packing,* we disavow the Administrative Law Judge's reliance on subjective considerations to determine why many employees repudiated the Union. It is not our intention to read the minds of the employees in an effort to ascertain whether, as found by the Administrative Law Judge, any loss of their support for the Union was attributable to the 'organizing tactics of the union representatives.'

However, even assuming the propriety of that approach, the record contains strong evidence that the loss of support was indeed to a considerable extent the result of Respondent's unlawful conduct. Thus, as noted above, there was testimony that some employees felt that Respondent was being 'squeezed' by the Union and should be given another chance and that the petition disavowing the Union stemmed from the employees' dissatisfaction with the postponement of the election by the Regional Director because of Respondent's unfair labor practices.

"In view of the foregoing, we conclude that the employees' majority designation of the Union as expressed in their authorization cards provides a more reliable measure of the employees' true desires than would be provided by an election. Accordingly, in order to protect the employees' statutory rights and interests, we find that Respondent's refusal to bargain violated Section 8(a)(5) and (1) of the Act and we shall issue a bargaining order."

The Board's analysis satisfies the dictates of both *Gissel* and *Peerless.* Cf. Walgreen Co. v. National Labor Relations Board, 509 F.2d 1014 af 1017–1018 (7th Cir. 1975).