558 F.2d 160
 95 L.R.R.M. (BNA) 2934, 82 Lab.Cas. P 10,019
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
EAGLE MATERIAL HANDLING, INC., a subsidiary of Somerset Tire
Service, Inc., and Somerset Tire Service, Inc.,
Respondents in No. 77-1186,
Eagle Material Handling of New Jersey, Respondent in No. 76-2256.
 Nos. 76-2256 and 77-1186.
 United States Court of Appeals,
Third Circuit.
 Argued March 31, 1977.
Decided June 22, 1977.
 
 Paul J. Spielberg, Deputy Asst. Gen. Counsel, Alan Banov, Atty., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D.C., for petitioner.
 William W. Lanigan, Edmond M. Konin, Lanigan, O'Connell and Hirsh, P.A., Basking Ridge, N.J., for respondents.
 Before ADAMS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 The National Labor Relations Board petitions for the enforcement of two orders entered against respondent Eagle Material Handling of New Jersey ("Eagle" or "the employer"). The first order directs Eagle to cease and desist from unfair labor practices in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1970), to recognize and bargain with the International Union of Operating Engineers ("the Union") as the exclusive bargaining representative of Eagle's service mechanics, and to restore the status quo ante with respect to certain changes made unilaterally by the employer following a representation election. The second order requires Eagle to cease and desist from unfair labor practices in violation of sections 8(a) (3) and 8(a)(5), 29 U.S.C. § 158(a)(3), (5) (1970), to reinstate four employees discharged in violation of section 8(a)(3), and, upon request, to bargain with the Union. Although we cannot sustain the 8(a)(5) violation, we conclude that substantial evidence in the record supports the Board's findings that Eagle engaged in unfair labor practices in violation of sections 8(a)(1) and 8(a)(3) of the Act, and that the remedies imposed did not exceed the Board's discretion. We therefore grant the Board's petitions for enforcement.I.
 
 
 2
 Eagle, a subsidiary of Somerset Tire Service, Inc. ("Somerset"), is engaged in the purchase, sale, and servicing of forklift trucks and related products. While attending a prearranged organizational meeting on January 11, 1975, five of Eagle's six service mechanics signed valid authorization cards on behalf of the Union's Local 825. Two days later, the Union filed a representation petition with the Board, a copy of which was served on the employer; on January 24 an agreement for a consent election to be held on February 6 was executed.
 
 
 3
 Prior to the election, Eagle's president, John Apgar, scheduled and conducted several meetings with the service mechanics. At the first meeting, held on January 20, Apgar asked what problems had prompted the employees to seek union representation. The mechanics related various complaints, including the insufficiency of wages and benefits and dissatisfaction with Service Manager Frank Veronsky. Apgar informed the employees at a second meeting, held a day or two later, that Veronsky was no longer with the company. In response to the president's inquiries at either the same or a subsequent session, the mechanics detailed the basic benefit package offered by the Union and discussed the comparable benefits provided by other forklift companies in the vicinity. Apgar explained that none of these benefits was "out of reach," and told the employees not to "underestimate Somerset Tire." He said that he would match or exceed the benefits provided by other companies, and that he would in time give the employees a benefit package that would be "the Cadillac of the industry."[1]
 
 
 4
 Eagle held an evening meeting, attended by all six service mechanics, within three days of the election. This session also involved a discussion of wages, union benefits, the employees' reasons for wanting a union, and problems that could and would be rectified. An additional meeting was conducted shortly before the election, attended by three employees and two company officials, including Apgar.[2] The employees expressed their concern that unless they voted for and won union representation, they might be fired or might not receive any improved benefits. Apgar said that he could alleviate their uneasiness. He began drafting a letter stating that no one would be fired for any reason during the next year, enabling the employees to have another election if they were dissatisfied, and that if an employee were discharged during that period that the company would pay a financial penalty. While Apgar and the employees were discussing the penalty, a company supervisor entered and informed Apgar that a lawyer had advised him of the illegality of the letter. Apgar thereupon destroyed the letter, wrote another saying that the employees would not be discharged for union activities, and promised that he would rewrite the original letter immediately after the election.
 
 
 5
 Approximately one week prior to the February 6 election, two company supervisors, Paul Desnoyers and James Schactele, had a conversation about five feet from where a service mechanic was working. Schactele was at the time in the process of lettering Eagle trucks, which were used both to deliver new forklifts and by the mechanics in making service calls. Desnoyers told him to defer lettering the trucks, because they might be used elsewhere in the company if the Union won the election.[3] Shortly thereafter, in response to the service mechanic's inquiry, Schactele confirmed that the mechanic had heard the conversation correctly, but said that he was going to have the trucks lettered anyway.
 
 
 6
 The Union lost the election, 4 votes to 2, and filed timely objections. After the election, the company instituted the following changes in the employment conditions of the service mechanics:
 
 
 7
 (1) Paid vacation was increased from one to two weeks per year.
 
 
 8
 (2) Employees were uniformly granted three sick days per year, in place of a prior practice that left sick pay within the discretion of the manager.
 
 
 9
 (3) Employees were granted three additional paid holidays per year.
 
 
 10
 (4) As of approximately March 1, 1975, the company eliminated an existing plan whereby the service mechanics shared a three percent monthly commission on parts sales and labor bills. In its stead the company introduced another program, vaguely described by employee witnesses who did not fully understand it as a "40 percent plan," and characterized by Apgar as a superior benefit.
 
 
 11
 (5) As of April 1, 1975, Eagle began paying the full cost of the employees' hospitalization. The employer had previously paid only one-half.
 
 
 12
 (6) As of August 1, 1975, the service mechanics were no longer allowed to keep company trucks at home to use for transportation to and from the plant or an outside job. The employees had been assured of this convenience as a condition of their hire.
 
 
 13
 On the basis of the facts described, the Board found that Eagle violated section 8(a)(1) when, in the period prior to the election, it solicited employee grievances, discharged Veronsky in response to employee complaints, threatened to move service equipment and work if the Union won the election, and promised the employees additional benefits and a written guarantee of continued employment all in order to discourage employee interest in the Union. The Board further found that the company violated section 8(a)(1) by implementing changes in employee benefits and working conditions in fulfillment of its unlawful preelection promises. Finally, the Board found that the union, having secured signed authorization cards from a majority of the employees, had attained majority status. The company's unfair labor practices, beginning on January 20, 1975, and continuing through the election, said the Board, dissipated the Union's majority and precluded the holding of a fair election.[4] The Board therefore concluded that the company had an obligation to bargain with the Union as of January 20, ordered Eagle to cease and desist from its unfair labor practices, and directed the restoration of the status quo ante with respect to those changes in benefits which were detrimental to the employees.
 
 II.
 
 14
 Our review of the order in this case entails a two-step inquiry. First, we must determine whether substantial evidence in the record as a whole supports the Board's findings of section 8(a)(1) violations. 29 U.S.C. § 160(e) (1970); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Then, if the evidence supports the Board's findings, we must determine whether the remedy ordered was within the Board's broad discretion, keeping in mind that the order should not be disturbed "unless it can be shown that (it) is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the (National Labor Relations) Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). Accord, Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 215-16, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); see 29 U.S.C. § 160(c) (1970).
 
 A.
 
 15
 Eagle contends that its solicitation of employee grievances prior to the union election was simply an exercise of an employer's legitimate prerogative; the preelection discussions with the service mechanics, Eagle asserts, fell within the protection of section 8(c) of the NLRA.[5] We recognize that the mere solicitation of employee grievances prior to an election is not an unfair labor practice. Landis Tool Co. v. NLRB, 460 F.2d 23, 25 (3d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972). As Judge Friendly has observed, "(A)n organizational drive often comes as a rude shock to an employer, and a simple offer to hear any complaints the employees may have, or to set up machinery to that end, is a natural and non-coercive response." NLRB v. Rollins Telecasting, Inc., 494 F.2d 80, 83 (2d Cir.), cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974). But when the employer's grievance solicitation is accompanied by promises of benefits contingent upon the employees' rejection of the union, such conduct constitutes an interference with the rights of employees guaranteed by section 7 of the Act, 29 U.S.C. § 157 (1970), and thereby violates section 8(a)(1),29 U.S.C. § 158(a)(1) (1970). Landis Tool Co. v. NLRB, supra, 460 F.2d at 24-25. Furthermore, it is an unfair labor practice for an employer actually to grant benefits to employees shortly before a representation election in order to induce them to vote against the union. See NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).
 
 
 16
 We believe that substantial evidence in the record as a whole supports the Board's conclusion that Eagle's solicitation of grievances carried an implied promise of benefits. This court has recognized that such promises need not be express to run afoul of section 8(a)(1). Landis Tool Co. v. NLRB, supra, 460 F.2d at 24-25. Accord, NLRB v. Rollins Telecasting, Inc., supra, 494 F.2d at 83-84. Moreover, the record also supports the Board's finding that the employer made explicit promises of benefits. Company president Apgar told a meeting of service mechanics that he would in time give them a benefit package that would be "the Cadillac of the industry" ; in addition, he offered the employees a guarantee of continued employment. The Board could reasonably infer that the employees understood fulfillment of these express and implied promises to be dependent upon their rejection of the Union.[6] We conclude, therefore, that the promises and the grievance solicitation that accompanied them interfered with the section 7 rights of the employees, thereby violated section 8(a)(1), and fell outside the protection of section 8(c).
 
 
 17
 The Board could also reasonably find that the company, in violation of section 8(a)(1), discharged supervisor Veronsky in order to induce the employees to vote against the Union. Although Apgar, Eagle's president, testified that the mechanics' complaints did not precipitate Veronsky's discharge, the Administrative Law Judge did not credit that testimony. We are not at liberty to disturb that credibility finding. See note 1 supra. Furthermore, the timing of Veronsky's dismissal prior to the election, and within a day or two after the meeting at which the service mechanics characterized him as the primary cause of their dissatisfaction permitted the inference that the company fired Veronsky for the purpose of encouraging antiunion votes in the pending election.
 
 
 18
 The record supports the Board's conclusion that the employer violated section 8(a)(1) by threatening to terminate its "outside" service work if the Union should win the election. See NLRB v. Gissel Packing Co., 395 U.S. 575, 618-20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Textile Workers v. Darlington Manufacturing Co., 380 U.S. 263, 274 n.20, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); Mon River Towing, Inc. v. NLRB, 421 F.2d 1, 9-11 (3d Cir. 1969). With a service mechanic working within hearing distance, supervisor Desnoyers instructed supervisor Schactele to delay having Eagle's service trucks lettered because the vehicles might be used elsewhere in the company (presumably in the parent company, Somerset) if the Union won the election. The ALJ inferred, and reasonably so, that the supervisors knew that the employee could hear their conversation. The determination whether a supervisor's statement amounts to a threat is a matter peculiarly within the Board's expertise. NLRB v. Gissel Packing Co., supra, 395 U.S. at 620, 89 S.Ct. 1918; Mon River Towing, Inc. v. NLRB, supra, 421 F.2d at 9; NLRB v. Triangle Publications, Inc., 500 F.2d 597, 599 (3d Cir. 1974). Eagle does not suggest that the company was not responsible for the statement of supervisor Desnoyers, see NLRB v. Dover Corp., 535 F.2d 1205, 1210 (10th Cir.), cert. denied, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976), and the record supports the Board's conclusion that the remark implied a threat to move work from Eagle's plant.[7] Accordingly, we sustain the Board's finding that the supervisor's statement violated section 8(a)(1).
 
 
 19
 We have somewhat more difficulty with the Board's finding that Eagle violated section 8(a)(1) by granting certain benefits after the representation election, but while objections to the election were pending before the Board. This circuit has not previously considered how such conduct fares under section 8(a) (1).[8]
 
 
 20
 Whether a post-election conferral of benefits constitutes an unfair labor practice depends, we believe, on the employer's purpose in granting the benefits. If the employer improves his employees' benefits after a representation election and while objections are pending in order to reward the employees for rejecting the union and to induce them to vote against the union in the event of a second election, his conduct violates section 8(a)(1). NLRB v. Gruber's Super Market, Inc., 501 F.2d 697, 702-03 (7th Cir. 1974); NLRB v. Furnas Electric Co., 463 F.2d 665, 669 (7th Cir. 1972); Luxuray of New York v. NLRB, 447 F.2d 112, 117-19 (2d Cir. 1971). But see Monroe v. NLRB, 460 F.2d 121, 125 (4th Cir. 1972); NLRB v. Ambox, Inc., 357 F.2d 138, 141 (5th Cir. 1966). See generally Annot., 8 A.L.R. Fed. 103, 113 (1971).
 
 
 21
 NLRB v. Exchange Parts Co., supra, which held that a preelection grant of benefits made to discourage collective employee activities violates section 8(a)(1), would appear to compel such a conclusion. A post-election conferral of benefits "undertaken with the express purpose of impinging upon (employees') freedom of choice for or against unionization and . . . reasonably calculated to have that effect," id. 375 U.S. at 409, 84 S.Ct. at 460, can interfere with the employees' section 7 rights just as much as the same conduct in a preelection context. To hold otherwise would be to reduce Exchange Parts to an easily evaded technical limitation on an employer's ability to interfere with his employees' rights by dispensing favorable treatment. See Luxuray of New York v. NLRB, supra, 447 F.2d at 119.
 
 
 22
 Eagle's purpose in granting benefits after the election while objections were pending, then, determines the legality vel non of its actions. The Board inferred that the employer's intention was to discourage support for the Union. "The question on this review is not whether we would have interpreted the employer's intention as did the Board in the first instance, but whether the Board's resolution of this factual issue is supported by substantial evidence on the record considered as a whole . . . ." Id. at 118. The Board's inference finds the requisite support in the record. Eagle's prior unfair labor practices demonstrate the company's propensity for interfering with the organizational rights of its employees, and suggest that its post-election grant of benefits was likewise improperly motivated. See NLRB v. Georgia Rug Mill, 308 F.2d 89, 91 (5th Cir. 1962) (Wisdom, J.). Furthermore, the similarity between the benefits cited by the employees prior to the election in explanation of their desire for a union and the benefits conferred by the employer after the election is indicative of Eagle's intention to discourage union membership. Although the post-election benefits were apparently granted to all of Somerset's employees, and not just to Eagle's service mechanics, certain testimony suggested that the company-wide conferral was actually calculated to avoid the appearance of impropriety.[9]
 
 
 23
 In sum, we conclude that all of the unfair labor practices found by the Board are supported by substantial evidence in the record as a whole. We turn now to the remedy ordered to cure the effects of those practices.
 
 B.
 
 24
 The Board concluded that an order directing Eagle, upon request, to recognize and bargain with the Union as the exclusive bargaining representative of its service mechanics was "required to remedy (Eagle's) extensive unfair labor practices" which had dissipated the majority status the Union once enjoyed. The Board's authority to issue such bargaining orders was sustained in NLRB v. Gissel Packing Co., supra. Under Gissel, a bargaining order may issue (1) even without a showing that the union at one point had authorization cards from a majority of the employees, when the employer's "outrageous" and " pervasive" unfair labor practices have eliminated the possibility of holding a fair representation election, id. at 613-14, 89 S.Ct. at 1940, or (2) in " less extraordinary cases marked by less pervasive practices," when there is a showing that the union once had a card majority and when the Board concludes that the extensiveness of the employer's unfair labor practices has "the tendency to undermine majority strength and impede the election processes." Id. at 614, 89 S.Ct. at 1940.
 
 
 25
 In recognition of "the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes," this court has adopted a rule requiring the Board to set forth a reasoned analysis justifying the imposition of a Gissel bargaining order. NLRB v. Armcor Industries, Inc., 535 F.2d 239, 244 (3d Cir. 1976). The Armcor rule effectuates the three goals of ensuring informed judicial review of the Board's bargaining orders, contributing to the "predictability of this important area of labor law," and providing a "prophylaxis against arbitrary exercise of the Board's power." Id. at 245. Eagle submits that in the instant case the Board did not make "specific findings as to the impact of the unfair labor practices on the election process and clearly explicate the basis for its decision to issue a bargaining order," id., and that we must therefore remand to the Board for further proceedings. We disagree.
 
 
 26
 We have carefully examined the findings made by the Board in support of its decision to issue a bargaining order. In addition, we have looked to the findings made by the ALJ in support of his recommendation that the Board issue such an order; because the Board affirmed his findings, we deem it appropriate to consider them in determining whether we have a sufficient explication of the basis for the Board's decision to issue a bargaining order. See generally NLRB v. Andrew Jergens Co., 175 F.2d 130, 136 (9th Cir.), cert. denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949); 2 K. Davis, Administrative Law Treatise §§ 10.03-.04 (1958).[10] Although the findings before us do not display the specificity that we would ideally desire, and although the explication of the basis for the Board's decision to issue a bargaining order lacks the lucidity that we would prefer, we are unable to say that the findings and analysis fail to comply with Armcor.[11]
 
 
 27
 The Board found that a bargaining order was necessary to remedy the employer's "extensive unfair labor practices" which had "dissipated the Union's majority status" as evidenced by signed authorization cards, and "precluded a fair election from being held." Clearly, the Board characterized this case as falling within the second Gissel category described above. The Board detailed the unfair labor practices that it believed had undermined the possibility of "holding a fair election in the near future, even after application of the Board's traditional remedies therefor." The ALJ noted that following the Union's filing of a representation petition, the employer had engaged in a series of actions "designed to convince the employees that their demands (would) be met through direct dealing with (Eagle) and that union representation could in no way be advantageous to them."
 
 
 28
 Obviously such conduct must, of necessity, have a strong coercive effect on the employees' freedom of choice, serving as it does to eliminate, by unlawful means and tactics, the very reason for a union's existence. . . . (T)here is (no) conduct which would constitute a greater impairment of employees' basic Section 7 rights under our Act, especially since such conduct by its very nature has a long-lasting, if not permanent, effect on the employees' freedom of choice in selecting or rejecting a bargaining representative.
 
 
 29
 Decision of Administrative Law Judge at 5, quoting Teledyne Dental Products Corp., 210 N.L.R.B. 435, 435-36 (1974) (footnote omitted). The ALJ went on to observe that the pernicious effect of the employer's unfair labor practices was evident in the dramatic decline in union support between January 11, when five of the six service mechanics signed union authorization cards, and February 6, when the Union lost the election 4-2. He concluded that the employer's promises, threats, and grants of benefits continuing into the post-election period were of such a nature as to have a long-range impact on freedom of choice within the small bargaining unit, making a fair rerun election highly improbable. Under the circumstances, he determined that the authorization cards reliably demonstrated the employees' representation desires and that a bargaining order was the only appropriate remedy.[12]
 
 
 30
 In light of these findings, which are supported by substantial evidence, we believe that the decision to issue a bargaining order was within the Board's discretion.[13] See NLRB v. Gissel Packing Co., supra, 395 U.S. at 612 n.32, 89 S.Ct. 1918. Furthermore, the Board could properly direct that the bargaining obligation be deemed to have commenced as of January 20, 1975. See Ann Lee Sportswear, Inc. v. NLRB, 543 F.2d 739, 744 (10th Cir. 1976). We also conclude that the other aspects of the remedy ordered, including the direction that Eagle restore the status quo ante with respect to changes made by the employer which were detrimental to the employees, were within the Board's discretion.
 
 III.
 
 31
 The alleged unfair labor practices underlying No. 77-1185 were committed shortly after the issuance of the ALJ's decision in No. 76-2256 ("Eagle I").
 
 
 32
 In June and August of 1975, two of Eagle's six service mechanics resigned and were not replaced. Beginning in September, the company began to decrease its service work. Eagle adopted the practice of selling new forklifts without dealer preparation or a warranty and reduced the sales price to compensate for the eliminated service. Similarly, customers who rented forklifts paid a reduced charge and accepted responsibility for maintaining the vehicles themselves. In October, Eagle's office manager informed one of the service mechanics that the company would henceforth do repair work only on forklifts manufactured by Allis-Chalmers, Eagle's franchisor. After November 11, one service mechanic no longer had any "preventive maintenance" work even though, he testified, Eagle previously had approximately twelve contracts to perform such work on some fifty to sixty forklifts.
 
 
 33
 On November 7, 1975, one week after the ALJ rendered his decision in Eagle I recommending a bargaining order, Eagle laid off two service mechanics. All four service mechanics were present when the company's general manager announced the layoffs, and they requested an explanation. The general manager replied that the layoffs were "for economic reasons." When one mechanic pointed out that there was plenty of work in the shop and that the employees were behind in their work, the manager responded, "I didn't say that we were not busy." There was testimony regarding the quantity of work to be done in Eagle's shop, and evidence that some work formerly done by Eagle's service mechanics was transferred to Eagle's parent, Somerset Tire.
 
 
 34
 On February 20, 1976, the company laid off its two remaining service mechanics. Eagle's office manager informed these employees that their layoffs were for economic reasons and that he would recall them if the work justified it. The two service mechanics testified that as of February 20 there were at least four repair jobs in the shop, and dealer preparation and warranty work to be done on new forklifts. Since February of 1976 the company has apparently discontinued all service and repair work on forklifts.
 
 
 35
 Based on these facts, the Board concluded that Eagle laid off its service mechanics in order to avoid bargaining with the Union as their representative, and therefore violated sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a) (3), (1) (1970). In addition, the Board found that although the company had an obligation to bargain with the Union as of January 20, 1975, when the company launched a campaign of unlawful conduct calculated to destroy the Union's majority status, it failed to give the Union any advance notice or opportunity to bargain about its changes in business practices or about the layoffs, and thereby violated sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5), (1) (1970). The Board ordered Eagle to cease and desist from its unfair labor practices, to offer the laid-off service mechanics reinstatement to their former or equivalent positions with back pay, and, upon request, to recognize and bargain with the Union.
 
 A.
 
 36
 An employer violates section 8(a)(3) and (1) of the Act by discontinuing a part of its business and laying off persons employed therein if the action is motivated at least in part by antiunion considerations. See NLRB v. Armcor Industries, Inc., supra, 535 F.2d at 243; NLRB v. Townhouse T.V. & Appliances, Inc., 531 F.2d 826, 828 (7th Cir. 1976); NLRB v. Princeton Inn Co., 424 F.2d 264, 265 (3d Cir. 1970). Conversely, an employer does not violate sections 8(a)(3) and (1) by discontinuing a part of its business and laying off employees if the action is motivated solely by economic considerations. NLRB v. Townhouse T.V. & Appliances, Inc., supra, 531 F.2d at 829. In this case, the Board was presented with evidence suggesting both economic and antiunion motivations for Eagle's actions.
 
 
 37
 The ALJ found that Eagle's opposition to the Union's attempt to organize its employees, and its prior unfair labor practices including a threat to move service work provided background material relevant to the determination of Eagle's motivation in laying off the service mechanics. All four of the laid-off mechanics, it should be noted, had signed union authorization cards during the organization drive. The first two discharges occurred within a week after the ALJ in Eagle I rendered his decision recommending that the Board issue a bargaining order to remedy the company's unfair labor practices. Some service mechanics testified that despite the assertion of Eagle's general manager that the layoffs were for economic reasons, there appeared to be considerable repair, maintenance, and preparation work available for them to perform. Furthermore, they said, some of the repair work formerly done in Eagle's shop was transferred to the parent company, Somerset Tire. There was similar testimony that service and repair work was also available in February 1976, when the last two service mechanics were laid off, allegedly for economic reasons. On the other hand, Eagle's general manager testified that business in the forklift industry fell off sixty to sixty-five percent in 1975, and that between February 1975 and February 1976 Eagle lost more than $150,000 before taxes. The company's escalating financial woes, he said, by February of 1976 compelled the elimination of Eagle's repair and service operations.
 
 
 38
 The ALJ discredited the manager's testimony, and observed that Eagle had provided neither corroboration of the manager's generalized assertions nor data establishing the extent to which the service and repair portion of the company's business had declined. The ALJ found that the manager gave no adequate explanation of why Eagle's repair and service work was completely abandoned. In the absence of any evidence establishing economic justification for the layoffs, the ALJ concluded that Eagle had laid off the four service mechanics in order to avoid bargaining with the Union in violation of sections 8(a)(3) and (1) of the Act. The Board affirmed these findings.
 
 
 39
 Substantial evidence in the record as a whole supports the inference that antiunion considerations provided at least partial motivation for Eagle's decision to lay off the four service mechanics. Eagle's antiunion bias and demonstrated unlawful hostility provided "proper and highly significant factors for Board evaluation in determining (the employer's) motive." NLRB v. Georgia Rug Mill, supra, 308 F.2d at 91. Furthermore, the timing of the first layoffs one week after the decision of the ALJ recommending a bargaining order supports the inference of antiunion motivation. See NLRB v. Treasure Lake, Inc., 453 F.2d 202, 204 (3d Cir. 1971). Finally, the lack of any credible evidence[14] that Eagle had any economic justification for the layoffs, and the presence of evidence to the contrary, permitted the inference that Eagle's motive was improper.
 
 
 40
 The Board also found that because of the retroactive bargaining order issued in Eagle I, the company had an obligation to bargain with the Union as of January 20, 1975, and that Eagle violated sections 8(a)(5) and (1) of the Act by failing to bargain about its changes in business practices or about the layoffs after that date. We cannot agree.
 
 
 41
 As we have pointed out above, the Board could in its discretion designate January 20, 1975, as the effective date of Eagle's bargaining obligation. Retroactive application of the bargaining order was, under the circumstances, a permissible means of restoring the status quo and dissipating the effects of the employer's unlawful conduct. See Ann Lee Sportswear, Inc. v. NLRB, supra, 543 F.2d at 744. But as the Board itself recognized in Eagle I, retroactive application of the remedy does not, in the absence of a demand for recognition, transform the employer's unilateral changes in employment conditions after the effective date of the bargaining order into independent violations of section 8(a)(5). See note 4 supra.[15] The imposition of a bargaining order does nothing to alter the settled rule that a demand by the Union for recognition is a prerequisite to the finding of a section 8(a)(5) violation by the employer. See NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 297, 59 S.Ct. 501, 83 L.Ed. 660 (1939); Steel City Transport, Inc. v. NLRB, 389 F.2d 735, 739 (3d Cir. 1968); Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732, 741 (1950). In the absence of any evidence in this case that the Union made a demand upon the employer for recognition, we cannot sustain the 8(a)(5) violation.
 
 
 42
 The facts of these cases illustrate the logical problems inherent in the Board's conclusion that Eagle violated section 8(a)(5) by failing to bargain about changes made after January 20, 1975. Apparently the union authorization cards from the service mechanics were not presented to Eagle prior to the election. The Union lost the election. In the next year, Eagle unilaterally made a number of changes in employment conditions and laid off all of the service mechanics who had not resigned voluntarily. Then, on June 21, 1976, the Board issued a bargaining order retroactive to January 20, 1975. The Board now urges that because of that bargaining order, all changes made unilaterally by Eagle after January 20, 1975, violated section 8(a)(5) even though the Union never requested recognition. What the Board overlooks is that the violations found must support the remedy ordered, not vice-versa; the Board's decision to fashion a retroactive remedy cannot ipso facto create violations where there would otherwise be none. There is a critical distinction between requiring Eagle to bargain, upon request, regarding changes made in the past a legitimate exercise of the Board's remedial power and finding 8(a)(5) violations in Eagle's failure to bargain about those changes when initially made.
 
 B.
 
 43
 Despite our disagreement with the Board over the existence of an 8(a)(5) violation, we find that the remedy ordered in this case was within the Board's discretion. Reinstatement with back pay was an appropriate remedy for the violation of sections 8(a)(3) and (1). See 29 U.S.C. § 160(c) (1970). We note that the Board's order does not specifically require restoration of Eagle's service and repair operations, but rather directs that the laid-off employees be offered reinstatement "to their former jobs or, if those jobs no longer exist, to substantially equivalent positions." (Emphasis supplied.)[16] Inasmuch as we have determined the bargaining order in Eagle I to be proper, we find it unnecessary to consider the appropriateness of the bargaining order in this case.
 
 IV.
 
 44
 The Board's petitions for enforcement will be granted.
 
 
 
 [1]
 Apgar denied using the quoted expression, but the Administrative Law Judge ("ALJ") credited employee witnesses who testified that Apgar used the phrase. We have no reason to disturb the ALJ's credibility findings. "(T)he final determination of credibility rests with the ALJ as long as he considers all relevant factors and sufficiently explains his credibility resolutions." NLRB v. Armcor Indus., Inc., 535 F.2d 239, 241 n.3 (3d Cir. 1976). See NLRB v. W. C. McQuaide, Inc., 552 F.2d 519 at 526 n.14 (3d Cir. 1977); Altemose Constr. Co. v. NLRB, 514 F.2d 8, 16 (3d Cir. 1975); NLRB v. Erie Marine, Inc., 465 F.2d 104, 106 n.3 (3d Cir. 1972)
 
 
 [2]
 The ALJ stated that two employees and three company officials attended this meeting. His error is easily explained: the transcript of the hearing before him misidentifies the employees as employers. The other facts detailed herein are as found by the ALJ and adopted by the Board
 
 
 [3]
 The ALJ construed "elsewhere in the company" to mean elsewhere in the parent company, Somerset
 
 
 [4]
 The ALJ found that the employer violated section 8(a)(5) by failing to bargain with the Union as of January 20 and by unilaterally implementing changes in working conditions after that date. In doing so, he construed the Union's representation petition, filed on January 13, as a demand upon Eagle for recognition. The Board determined that there could be no section 8(a)(5) refusal-to-bargain violation based merely upon the Union's petition without a demand upon the employer for recognition or bargaining
 
 
 [5]
 Section 8(c), 29 U.S.C. § 158(c) (1970), provides:
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.
 
 
 [6]
 The requirement that we sustain the Board's findings with respect to questions of fact if supported by substantial evidence on the record as a whole applies to inferences as well as to evidentiary facts. Trico Prods. Corp. v. NLRB, 489 F.2d 347-352 (2d Cir. 1973); Landis Tool Co. v. NLRB, supra, 460 F.2d at 26; Radio Officers' Union v. NLRB, 347 U.S. 17, 48-52, 74 S.Ct. 323, 98 L.Ed. 455 (1954); id. at 55-57, 74 S.Ct. 323 (Frankfurter, J., concurring)
 
 
 [7]
 Eagle urges that the supervisor's statement was not shown to have influenced the vote of any employee, and therefore could not have been a violation of section 8(a)(1). This suggestion misperceives the showing necessary to make out an 8(a)(1) violation. As we said in Local 542, Int'l Union of Operating Eng'rs v. NLRB, 328 F.2d 850, 852-53 (3d Cir.), cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964),
 The fact that no one was in fact coerced or intimidated is of no relevance. The test of coercion is not whether the misconduct proves effective. The test is whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.
 Accord, NLRB v. Triangle Publications, Inc., supra, 500 F.2d at 598.
 
 
 [8]
 NLRB v. Gentithes, 463 F.2d 557, 559 (3d Cir. 1972), expressly avoided deciding whether the holding of Exchange Parts, supra, that a preelection grant of benefits made to discourage union activities violates section 8(a)(1), could be extended to a post-election context
 
 
 [9]
 In any event, that the benefits were extended to the whole company does not conclusively imply that the company's motives were innocent. Luxuray of New York, supra, 447 F.2d at 119; cf. NLRB v. Exchange Parts Co., supra, 375 U.S. at 410, 84 S.Ct. 457 (that preelection grant of benefits is not conditioned on defeat of union is not dispositive)
 
 
 [10]
 In Armcor, unlike this case, the findings of the ALJ affirmed by the Board added nothing to the findings mentioned in the decision of the Board itself. The Board and the ALJ provided identical statements in support of the necessity for a bargaining order
 
 
 [11]
 The bargaining order in the instant case was entered before we rendered our decision in Armcor. We mention this not because pre-Armcor bargaining orders are subject to less searching review than post-Armcor orders, but rather to explain why the Board's findings and analysis are not more complete. This case displays what we consider to be minimally sufficient compliance with Armcor
 
 
 [12]
 The Seventh Circuit has found that similar findings satisfy its equivalent of our Armcor rule. Compare Peerless of America, Inc. v. NLRB, 484 F.2d 1108 (7th Cir. 1973) (Cummings, J.) (establishing Armcor -type rule), with Altman Camera Co. v. NLRB, 511 F.2d 319, 323 & n.4 (7th Cir. 1975) (Cummings, J.)
 
 
 [13]
 Eagle contends that question of enforcement of the bargaining order is moot because the service mechanics have terminated their employment with Eagle. Inasmuch as their termination was the result of an unfair labor practice, see Part III-A infra, we find that the question of enforcement is not moot
 
 
 [14]
 Both the ALJ and the Board found the testimony of Eagle's general manager to be incredible, and we have no cause to disturb that finding. See note 1 supra
 
 
 [15]
 It is noteworthy that in Ann Lee Sportswear, Inc., supra, the Board imposed a retroactive bargaining order but found no section 8(a)(5) violations
 
 
 [16]
 Eagle contended at oral argument that the reinstatement order should not be enforced because the laid-off employees had already been offered reinstatement and refused it. Counsel for the Board suggested that the reinstatement offers were not unconditional. We cannot resolve this dispute with nothing in the record before us, but we recommend that the issue be considered in the compliance proceedings