**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ROLLINS TELECASTING, INC., Respondent.**

No. 332, Docket 73–1888.

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1974.

Decided Feb. 25, 1974.

Rehearing Denied April 16, 1974.

Warren C. Ogden, N. L. R. B. (Peter G. Nash, Gen. Counsel, N. L. R. B., John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, Charles N. Steele, N. L. R. B., of counsel), for petitioner.

James M. Walters, Atlanta, Ga. (Fisher & Phillips, John Bacheller, Jr., and James B. Rhoads, Atlanta, Ga., of counsel), for respondent.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This petition to enforce an order of the National Labor Relations Board, 199 N.L.R.B. No. 92, involves the recurring pattern of a union organizational drive, concomitant discharges of employees known to be active in it, and efforts of a company executive to persuade employees not to support the union. Unlike many such cases, this controversy went to a Board-conducted election. In light of the Board's rulings with respect to challenges, Teamsters Local Union No. 648 may have won the election; the company does not deny that it must recognize the union in that event. However, the Board confirmed the ruling of Administrative Law Judge Blackburn that even if the union should turn out to have lost the election, it had achieved an authorization card majority. In consequence, the Board authorized a bargaining order under § 8(a)(5) because of the discriminatory discharges of two leaders in the union's campaign. NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We have no quarrel with this conclusion, the findings of discriminatory discharges, and the relief accorded for them. On these points we see nothing that can usefully be added to the thorough discussion by the Administrative Law Judge, who rejected many of the General Counsel's claims, and the Board's decision, which rejected another. Our concern is rather with the finding that the respondent violated § 8(a)(1) by making coercive statements in the midst of a union organizational campaign. In considering that finding, we face the familiar tension between § 8(a)(1) and the protection accorded an employer by § 8(c) of the Act. See NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 616–620, 89 S.Ct. 1918, 23 L.Ed.2d 547. Two incidents are involved, a speech by a high company official and an informal remark by a middle-level supervisor.

The more important of the two incidents was the talk and question-and-answer session conducted by James Roddey, vice-president of Rollins, Inc., respondent's parent corporation. As the head of Rollins' media division, Roddey was in charge of the company's various media outlets, including WPTZ, the Plattsburgh, N. Y., television station with which we are here concerned. The Board found that the speech "was understood by the employees to mean in its totality that it would be futile for them to vote for [the union]." This rested on three subordinate findings:

(1) That Roddey had in effect threatened plant closure by saying that Rollins had previously closed a business enterprise rather than deal with the Teamsters;

(2) That he warned the employees that if the Teamsters called a strike, they would lose their jobs "temporarily or permanently," through replacements; and

(3) That he suggested the employees organize a committee to deal with Rollins and indicated they would benefit by such a procedure.

Chairman Miller did not agree that the first two statements violated § 8(a)(1). He concluded that the third statement was unlawful, however, because it "contained a veiled promise of benefit for foregoing unionization and dealing directly with Respondent."

There is no dispute that Roddey made statements on each of the three topics on which the Board focused, but his version of his remarks differed substantially from the Board's characterization. On the first point, he testified that in an endeavor to counter reports circulated by the union that the Teamsters were very tough and could put pressure on Rollins through other contracts with it and other companies, he had said only that he also was a hard bargainer and that the only connection Rollins had ever had with the Teamsters concerned an office in Florida they had organized. Subsequently, he said, "it had been the Company's decision that rather than submit to the demands that we felt were unreasonable, we would prefer to close that office." On the other hand, four employees who attended the meeting gave a significantly different version of Roddey's remarks. As one of them put it, "He told us . . . that the union did have at least one [unionized shop] in Florida and rather than bargain with the union, they [Rollins] closed the plant." The other three recalled Roddey's remark in similar terms.

 If Roddey's testimony stood alone, we would have difficulty in finding a violation of § 8(a)(1). See NLRB v. River Togs, Inc., 382 F.2d 198, 201–202 (2 Cir. 1967), quoted with approval in NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 619, 89 S.Ct. 1918, 23 L.Ed.2d 547; Snyder Tank Corp., 177 N.L.R.B. 724, 730–31 (1969), enforced, 428 F.2d 1348 (2 Cir. 1970); Federal Prescription Service, Inc., 203 N.L.R.B. No. 145 (1973); Sanders Leasing System, Inc., 204 N.L.R.B. No. 68 (1973). But here there is the testimony of what four employees understood Roddey to have said.

The Administrative Law Judge, not attempting to resolve the conflict between the two versions of the speech, apparently went on the ground that it sufficed if employees reasonably understood, or more accurately misunderstood, Roddey to have threatened closure in the event of a union victory. The Board's statement is so cryptic that we cannot tell whether it resolved the conflict against Roddey, as it permissibly could have, or, as seems more likely, followed the reasoning of the Administrative Law Judge. Assuming that it took the latter course, we cannot fault the decision. An employer who goes so close to the brink takes the risk that employees may honestly misunderstand him; Roddey could easily have avoided the likelihood of being misunderstood by adding that Rollins would not close simply because of a Teamster victory but only if the union's demands made continuation impracticable. *Gissell, supra,* 395 U.S. at 620, 89 S.Ct. 1918, 23 L.Ed.2d 547.

 On the second point, Roddey testified that he had "told the people that if they did strike under certain circumstances, that they could be replaced temporarily or in other circumstances they could be replaced permanently." Three of the employees who attended the meeting confirmed that account. Both the Administrative Law Judge and the Board, however, characterized his comment as a threat that the company *would* replace any strikers. We see no basis for the Board's interpretation, and conclude that Roddey's statement that economic strikers could lose their jobs "temporarily or permanently" was within the protection of § 8(c).[1] NLRB v. Herman Wilson Lumber Co., 355 F.2d 426 (8 Cir. 1966). If the Board meant to suggest that an employer resisting organization must deliver a lecture on the reinstatement rights of economic strikers under Laidlaw Corp., 171 N.L.R.B. 1366 (1968), enforced, 414 F.2d 99 (7 Cir. 1969), cert. denied, 397 U.S. 920, 90 S.

---

1. The Board did not explain its ruling on this point, although Chairman Miller wrote in dissent: "The Board, in *Texaco, Inc.,* 178

N.L.R.B. 434, found similar statements did not exceed the bounds of propriety afforded by Sec. 8(c) of the Act."

Ct. 928, 25 L.Ed.2d 100 (1970), that goes too far, as the Board recently held, Mississippi Extended Care Center, 202 N.L.R.B. No. 139 (1973).

Finally, with respect to the third point, Roddey testified that, in answer to complaints that the cost of living in Plattsburgh was high and the pay at WPTZ was low, he said that if the employees "would like to get something together, either individually or as a group or committee" and talk to him, he would be willing to listen; he added that at another station where a union attempting organization had lost an election, "the Company had formed a committee of employees, and this was working very successfully." Once again, if his testimony had stood alone, we would be unable to agree with the Administrative Law Judge and the Board that he had crossed the forbidden line between merely soliciting complaints and promising benefits if the union organizational drive was defeated. As in the case of the threat to close the plant, however, the employees' version of the speech differed sharply from Roddey's. One of them testified:

> He said that the Company had overlooked the employees of WPTZ; that he realized that we were underpaid; that he didn't feel we had to bring a Union in; that he didn't feel we needed a third party to negotiate on the salaries. He said that if we did bring a union in, that he was the man they had to bargain with, and he was tough to bargain with.

Another testified that Roddey had said that "these were some of the things that the Company could do for the employees without the Union, and one would be to look at comparable markets to find out the salary rates and the different positions, and also to set up a grievance committee; that if an employee had a grievance he could take it to the committee, and they would throw it around and make a decision." A third commented, "He did express that he didn't know things were this bad at Station WPTZ . . . . He said that he thought things could be worked out better."

The Administrative Law Judge found that the employees understood these remarks as a veiled promise of benefits if they rejected the union. In addition, he found that Roddey had attempted to persuade the employees that organizing a committee to deal with him "would be better for them than going union by assuring them he would act if their claim that they were grossly underpaid proved accurate by area standards." The Board agreed, concluding that Roddey had "suggested that the employees organize a committee to deal with Respondent and indicated that they would benefit by such a procedure."

We see no basis for upsetting the Board's resolution of the conflict in the testimony. There is sufficient evidence in the record to support the view that Roddey's talk, both in intent and effect, suggested that the employees could expect wage increases and other benefits if they formed a grievance committee within the station, whereas these benefits would not be so readily available through collective bargaining. The closer question is whether that suggestion unlawfully interfered with the employees' § 7 organizational rights and fell outside the protection of § 8(c).

It is plainly not unlawful for an employer to hold a "gripe session" during a union campaign; an organizational drive often comes as a rude shock to an employer, and a simple offer to hear any complaints the employees may have, or to set up machinery to that end, is a natural and non-coercive response. Fairchild Camera Corp. v. NLRB, 404 F.2d 581 (7 Cir. 1968); Furr's, Inc., 157 N.L.R.B. 387 (1966); ITT Telecommunications, 183 N.L.R.B. No. 115 (1970); Golden Arrow Dairy, 194 N.L.R.B. No. 81 (1971). It is only when this is accompanied by an employer's promises of benefits contingent on rejection of the union that it becomes suspect under § 8 (a)(1). To be sure, the promise of benefits in this case is far milder than the

direct wage increases conferred in NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Nonetheless, courts have upheld Board findings of implied promises of benefits in situations very similar to this one. In NLRB v. Drives, Inc., 440 F.2d 354, 364 (7 Cir.), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971), the court upheld the Board's ruling that an employer had violated § 8(a)(1) when he distributed a survey shortly before a representation election requesting employees to make specific suggestions for improvements in working conditions and implying that the improvements would come only if the union were defeated. Similarly, in H. L. Meyer v. NLRB, 426 F.2d 1090 (8 Cir. 1970), the court agreed with the Board that the employer had violated § 8(a)(1) by installing a suggestion box during an organizational campaign and implying, through its answers to the questions submitted, that the employees would get a wage increase if the union lost the election. In NLRB v. Flomatic Corp., 347 F.2d 74, 76–77 (2 Cir. 1965), this court held that various promises of benefits and an invitation to deal directly with the company violated § 8(a)(1). While the promises in *Flomatic* were somewhat more explicit than those in this case, Roddey's promise to look into the employees' wage complaints, if presented through a committee, together with his characterization of himself as a hard bargainer with unions, strongly suggested that they could expect wage increases if, and perhaps only if, they dealt directly with the company. See also NLRB v. S & H Grossinger's, Inc., 372 F.2d 26, 28 (2 Cir. 1967); Conolon Corp. v. NLRB, 431 F.2d 324 (9 Cir. 1970), cert. denied, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971); Texaco, Inc. v. NLRB, 436 F.2d 520, 524 (7 Cir. 1971); Vaughan Printers, Inc., 196 N.L.R.B. No. 32 (1972); Aldon, Inc., 201 N.L.R.B. No. 75 (1973); Coleman Co., 203 N.L.R.B. No. 160 (1973). Thus, in light of the Board's factual findings, we agree that Roddey made unlawful promises of bene-

fits to the WPTZ employees, which were implicitly contingent on their rejecting the union.

■ Besides Roddey's talk, the Administrative Law Judge pointed to another incident of allegedly unlawful employer speech. Early in the union's organizational campaign, Chief Engineer Lincoln Dixon told one of the employees that "it was too bad the only people that would get hurt would be the employees . . . that the Company was already making arrangements to bring people in in the event of a strike and they could keep running a lot longer than the employees could who would go out on strike." Considering the remark in context, the Administrative Law Judge deemed it coercive because it helped convey the message that it would be futile for the employees to vote for the union. Although Dixon's comment was apparently an off-hand remark rather than a formal expression of company policy, he spoke in terms of the company's plans and actions, and the employees could reasonably conclude that he spoke as an informed member of management on that point. See Irving Air Chute Co. v. NLRB, 350 F.2d 176, 179 (2 Cir. 1965); Trey Packing, Inc. v. NLRB, 405 F.2d 334 (2 Cir. 1968), cert. denied, 394 U.S. 919, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969); NLRB v. Patent Trader, Inc., 415 F.2d 190 (2 Cir. 1969). Unlike Roddey, Dixon paid no heed to the critical line between a prediction of the probable economic consequences of unionism and a threat of employer reprisal, see NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 618, 89 S.Ct. 1918, 23 L.Ed.2d 547; NLRB v. Taber Instruments, Division of Teledyne, Inc., 421 F.2d 642, 644 (2 Cir. 1970); NLRB v. General Stencils, Inc., 438 F.2d 894, 900 (2 Cir. 1971); NLRB v. Erie Marine, Inc., 465 F.2d 104 (3 Cir. 1972); NLRB v. Roselyn Bakeries, Inc., 471 F.2d 165 (7 Cir. 1973); Amalgamated Local Union 355 v. NLRB, 481 F.2d 996, 1004 & n. 13 (2 Cir. 1973). Dixon did not merely say that the company would be able to replace strikers, he warned that it fully intended to do so,

and that plans were already afoot to provide replacements in the event of strike.[2] Accordingly, we conclude that the Administrative Law Judge could reasonably find that Dixon's comment constituted a threat of reprisal which violated § 8(a)(1) and was not protected by § 8(c). *Cf.* Lake City Foundry Co. v. NLRB, 432 F. 2d 1162 (7 Cir. 1970).

We shall therefore direct that paragraph 1(e) in the Board's order be modified to read: "Threatening employees with loss of their jobs if they vote for union representation." This modification does not require remand with respect to the bargaining order since that order rested on the discriminatory discharges rather than the § 8(a)(1) violations.

Enforced as modified. The Board may recover two-thirds its costs.

Stevens, Circuit Judge, filed concurring opinion in which Swygert, Chief Judge and Kiley, Senior Circuit Judge, joined; Swygert, Chief Judge, filed additional concurring opinion.

2. There is no indication anywhere in the record that the company was, in fact, making any such plans or that the proposed ac-

tion was based on an analysis of economic necessities in the light of available facts.