139 F.3d 135
 157 L.R.R.M. (BNA) 2649, 135 Lab.Cas. P 10,127,
21 Employee Benefits Cas. 2793
 BEVERLY ENTERPRISES, INC., Beverly Health and Rehabilitation
Services, Inc., Beverly Enterprises--Connecticut,
Inc. d/b/a Greenwood Health Center,
Petitioners-Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.
 Nos. 110, 264, Dockets 96-4171, 96-4211.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 3, 1997.
Decided March 9, 1998.
 
 Michael Flaherty, Jackson, Lewis, Schnitzler & Krupman, White Plains, NY, (Thomas P. McDonough, Jackson, Lewis, Schnitzler & Krupman, White Plains, NY), for Petitioners-Cross-Respondents.
 John D. Burgoyne, Assistant General Counsel; National Labor Relations Board, Washington, DC, (Frederick C. Havard, Supervisory Attorney; National Labor Relations Board, Washington, DC; Frederick L. Feinstein, General Counsel, National Labor Relations Board, Washington, DC; Linda Sher, Associate General Counsel, National Labor Relations Board, Washington, DC; Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, DC), for Respondent-Cross Petitioner.
 Before: MINER and LEVAL, Circuit Judges,and GRIESA, District Judge.*
 GRIESA, District Judge, concurs in a separate opinion. LEVAL, Circuit Judge, concurs in part and dissents in part in a separate opinion.
 MINER, Circuit Judge:
 
 
 1
 Petitioners-cross-respondents Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc., and Beverly Enterprises--Connecticut, Inc. d/b/a Greenwood Health Center petition for review of a decision and order of the National Labor Relations Board ("NLRB") affirming a decision by an Administrative Law Judge ("ALJ"). Respondent-cross-petitioner National Labor Relations Board, by its General Counsel ("General Counsel"), petitions for enforcement of the same decision and order. The NLRB determined that petitioners had engaged in unfair labor practices prior to a representation election, in violation of section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1). It found (1) that by revealing existing benefits previously concealed, petitioners actually conferred benefits upon employees for the purpose of coercing them to vote against unionization; (2) that petitioners promised an across-the-board wage increase to discourage unionization; and (3) that petitioners solicited a grievance during the union organizational campaign, promised to resolve that grievance, and satisfied that promise. Based on these findings, the NLRB ordered petitioners to cease and desist from the unfair labor practices, post notices of the order and conduct a new election.
 
 
 2
 For the reasons that follow, we grant the petition for review insofar as the order directs petitioners to cease and desist from unfair labor practices and to post notices.
 
 BACKGROUND
 I. Benefits Information
 
 3
 Beverly Enterprises--Connecticut, Inc., d/b/a Greenwood Health Center ("Greenwood"), is one of many health care facilities operated by Beverly Enterprises, Inc. ("Beverly Enterprises"). Beverly Health and Rehabilitation Services, Inc., is an affiliate of Beverly Enterprises. Greenwood is located in Hartford, Connecticut, and employs approximately 250 employees. It is undisputed that the employees at Greenwood were entitled to a variety of employee benefits, the majority of which were outlined in the Greenwood Health Center Personnel Manual ("Personnel Manual"), which was published in August of 1989. Benefits listed and generally described in the Personnel Manual included: health, life, and dental insurance; a stock-purchase plan; a savings-retirement plan; a discount for relatives of employees admitted to a facility owned by Beverly Enterprises; a tuition reimbursement plan; sick time; holidays; vacation; jury duty compensation; marriage leave; bereavement leave; and paternity leave. Employees were permitted to exchange their holiday, vacation, and insurance benefits for a 10 percent wage increase. Greenwood's administrator, Pamela Miller, did not distribute copies of the Personnel Manual to employees. She did distribute copies to the department heads, who then made them available to the employees for review.[1]
 
 
 4
 In addition to the benefits identified in the Personnel Manual, Greenwood employees were entitled to "regional benefits," which were established by the regional corporate office of Beverly Enterprises. Included among these benefits was a more generous tuition reimbursement plan. Rather than the $750.00 annual tuition reimbursement described in the Personnel Manual, the regional benefits plan allowed up to $1,200.00 in annual tuition reimbursement. Miller admitted that she failed to update the Personnel Manual to include information relating to the regional tuition reimbursement plan. Although Greenwood employees generally were aware of the existence of a tuition reimbursement program, and while some had taken advantage of this benefit, it appears that the additional amount available under the regional benefit was not widely known.
 
 
 5
 Employees also were entitled to various benefits set forth in the Benefits Administration Policy and Procedures Manual ("Corporate Manual"), which was prepared in 1992 and sent to facility administrators. Some of the benefits listed in the Corporate Manual were duplicative of those listed in the Personnel Manual, such as the health insurance and stock-option plans. However, the Corporate Manual also provided a description of other benefits, such as the Dependent Care Assistance Program ("DCAP"), which provided reimbursement for 20 percent of the cost of care for dependent children and disabled family members, and a 401(k) savings plan that replaced the savings-retirement plan described in the Personnel Manual. The Corporate Manual also contained a page entitled "Benefits at a Glance," which listed and described, among other things, the DCAP, 401(k) plan and the stock-option plan.
 
 
 6
 According to several employees, the Personnel Manual was generally available for review at nurses' stations. Greenwood also received approximately 100 copies of a bi-weekly newsletter, entitled "Beverly Cares," which occasionally discussed available benefits and encouraged employees to call their facility administrator or human resources representative for additional information. For example, the October 1993 "Beverly Cares" newsletter informed employees that it was time to choose and enroll in benefit plans, including the DCAP and 401(k) plans, and provided a phone number that employees could call with questions. Copies of the newsletter were placed in the reception area for any interested employee or visitor to take. Finally, Beverly circulated notices for posting in the Greenwood facility regarding enrollment in benefit plans, and also informed employees of benefits through the issuance of flyers, brochures, and memoranda.
 
 
 7
 Under Miller's administration, Greenwood employees complained that management personnel did not provide uniform information about the benefits available to them. There were also allegations that information was concealed from employees, and that some employees were provided with misinformation.
 
 II. Union Campaign
 
 8
 In November of 1993, the New England Health Care Employees Union, District 1199, AFL-CIO (the "Union") began an organizational campaign at Greenwood. At about the same time, Patricia Wilcox, the director of development at Greenwood, asked Greenwood employee Elizabeth Garcia while passing her in the hallway, "[W]hat brought this on?" Garcia took this to be in reference to the union organizational campaign. Garcia responded that the lack of knowledge of the benefits and the favoritism in distributing information motivated the Union organizational campaign. Garcia also testified that Wilcox then responded that she would see what she could do.
 
 
 9
 The Union officially requested recognition on December 13, 1993. Shortly thereafter, a benefits summary prepared by Wilcox and reviewed by Miller was distributed at the nurses' stations at Greenwood. The summary, with the exception of the first page, was comprised principally of information from the Personnel Manual. Benefits outlined in the summary included: bereavement leave; the employee discount for relatives; jury duty compensation; marriage leave; paternity leave; the $750 tuition reimbursement; and vacation. This summary did not include information on the DCAP, the 401(k) plan, the stock-purchase plan, or the regional tuition reimbursement.
 
 
 10
 There was some confusion among both employees and management over vacation time, because the summary included a handwritten change of the vesting period for a 3 week vacation from 5 years to 3 years.[2] Greenwood unit coordinator Maria Parks told Garcia that the vesting period was 5 years while Director of Nursing Maria Faria told Garcia she was unsure of the operative vesting period. Garcia then asked Administrator Miller about this benefit and Miller informed Garcia that the vesting period was 3 years. Garcia testified that, after being provided this information, Miller commented, "[s]ee, all you have to do is ask."
 
 
 11
 Sometime prior to the February 1994 Union representation election, a series of meetings was conducted by Jay Begley, a human resources officer who was put in charge of Greenwood's anti-union campaign management. At those meetings, Begley distributed a second benefits summary, which, unlike the earlier summary, included the "Benefits at a Glance" page from the Corporate Manual describing the DCAP, 401(k) and stock-option plans. According to nurses Patricia Pickus and Donna Nelson, at one meeting Begley and Faria told the employees that Greenwood was also working on a 4 percent, across-the-board raise for the employees. Miller purportedly confirmed the possibility of a raise at that meeting.
 
 
 12
 At a representation election held on February 17, 1994, the employees rejected Union representation by a vote of 16 to 11. On February 24, 1994, the Union filed objections to the election with the regional offices of the NLRB, asserting that Beverly had committed various unfair labor practices related to the election, in violation of the NLRA.
 
 III. NLRB Decision and Order
 
 13
 Between September 11 and September 15, 1995, a hearing before an ALJ was held at the NLRB's regional offices. Based on the comment "all you have to do is ask" made by Miller to Garcia, the ALJ determined that Miller operated under a policy where benefits information was distributed only if an employee asked for the information. The ALJ determined that this policy was intended to save Greenwood labor costs. In addition, the ALJ noted from the testimony of certain Greenwood employees that Greenwood management personnel concealed information from employees, and even provided them with misinformation. The ALJ found that employees Patricia Pickus and Donna Nelson were not directly informed about all the benefits available to them, but only received information on vacations and personal and sick leave. The ALJ also concluded that Greenwood's director of nursing, Maria Faria, "ignored" the existence of the Personnel Manual when she told Pickus that there was no book or other written material describing the benefits available to Greenwood employees. The ALJ acknowledged the existence of additional sources of benefits information, such as the "Beverly Cares" newsletter, but found them to be of minimal value, citing employee testimony that little attention was paid to these sources of information. Based primarily upon these findings, the ALJ determined that Greenwood committed an unfair labor practice by initially concealing information on existing benefits and then issuing summaries of existing benefits during the Union organizational campaign. The ALJ equated such concealment to the conferral of benefits upon employees for the purpose of coercing the employees into voting against the Union.
 
 
 14
 Crediting the testimony of employees Pickus and Nelson, the ALJ also found that at one meeting immediately prior to the Union organizational campaign, Greenwood's anti-union campaign manager, Jay Begley, and administrator Maria Faria, told the employees that Greenwood was working on a 4 percent, across-the-board raise for the employees. The ALJ determined that this constituted an implied promise of a wage increase and as such was an unfair labor practice.
 
 
 15
 The ALJ finally determined that at about the time the Union organization activities began, Wilcox asked Garcia while passing her in the hallway, "what brought this on?" Garcia took this to be in reference to the union organizational campaign. Garcia answered:
 
 
 16
 benefits--the lack of knowledge of the benefits that we have; the favoritism--that some nurses knew about benefits and received benefits, while other nurses didn't receive benefits; the fact that I had to take a cut in pay and work to receive benefits, whereas Patty Pickus, whose husband was working, and my husband was unemployed and not receiving unemployment had--I had to take a cut in pay, but she didn't have to take a cut in pay.
 
 
 17
 Garcia testified that Wilcox then responded that she would see what she could do. Within a few days, Garcia was presented with the first benefits summary. The ALJ determined that this amounted to an unfair labor practice in the form of a solicitation of a grievance and a promise to redress the grievance.
 
 
 18
 Accordingly, the ALJ ordered that Greenwood cease and desist from the unfair labor practices, that it post the cease and desist order, and that the election be set aside because, by its unfair labor practices, Greenwood interfered with the employees' free choice. On June 11, 1996, Greenwood filed its objections to the ALJ's decision with the NLRB. On September 30, 1996, the NLRB affirmed the ALJ's decision and adopted the order, making only a minor modification concerning the posting of the order. Greenwood filed a petition for review on November 9, 1996. The General Counsel filed a cross-petition for enforcement of the order on December 20, 1996.
 
 DISCUSSION
 
 19
 Greenwood challenges each of the three section 8(a)(1) violations identified by the NLRB. Section 8(a)(1) of the NLRA deems any act that would "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the NLRA]" an unfair labor practice. 29 U.S.C. § 158(a)(1). Under section 7, employees have, inter alia, the "right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Among the activities proscribed by section 8(a)(1) are promising to grant or granting wage increases as a means of discouraging support for unionization, see J.J. Newberry Co. v. NLRB, 645 F.2d 148, 151-52 (2d Cir.1981), promising to grant or granting other benefits to discourage support for the union, see NLRB v. J. Coty Messenger Serv., Inc., 763 F.2d 92, 96 (2d Cir.1985), and soliciting grievances and promising to remedy the problems complained of in the course of a union campaign, see HarperCollins San Francisco v. NLRB, 79 F.3d 1324, 1330 (2d Cir.1996).
 
 
 20
 An employer may oppose unionization of its workforce and in so doing enjoys free speech protection under section 8(c) of the NLRA, "which allows the employer to express any views, argument, or opinion in any media form without committing an unfair labor practice provided that such expression contains no threat of reprisal or force or promise of benefit." Kinney Drugs, Inc. v. NLRB, 74 F.3d 1419, 1428 (2d Cir.1996) (quotations and citation omitted).
 
 
 21
 "We uphold the NLRB's factual findings if they are supported by substantial evidence ... [which] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kinney Drugs, 74 F.3d at 1427 (quotations and citations omitted). "Even if a court could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence." Id. We review de novo the NLRB's application of the law to the facts, but we defer to the NLRB's "choice between two fairly conflicting views." AT & T v. NLRB, 67 F.3d 446, 451 (2d Cir.1995) (citation and quotation omitted). We accept the NLRB's legal conclusions when they are reasonably based. See NLRB v. Katz's Delicatessen of Houston St., Inc., 80 F.3d 755, 763 (2d Cir.1996).
 
 A. Benefits Summaries
 
 22
 Greenwood argues that the NLRB erred in finding that Greenwood's distribution of benefits summaries during a union campaign constituted the granting of a benefit. Specifically, Greenwood contends that the NLRB's decision is contrary to existing precedent and is unsupported by the record. We agree. It is well-established that an employer violates the NLRA by promising to grant benefits in order to discourage unionization. See HarperCollins, 79 F.3d at 1329. "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove." NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). However, the NLRB has held that an employer does not violate section 8(a)(1) by publicizing existing benefits during a union organizational campaign. See Ideal Macaroni Co. and Teamsters Local No. 407, Int'l Bhd. of Teamsters, 301 N.L.R.B. 507, 507 (1991) (enforcement denied on other grounds, 989 F.2d 880 (6th Cir.1993)); Huttig Sash and Door Co. and UAW Local 376, 300 N.L.R.B. 93, 96-97 (1990) (election eve announcement of existing pension benefits was not akin to announcing new or future benefits and therefore was not violative of section 8(a)(1)). We think that this is the correct view.
 
 
 23
 In Ideal Macaroni, after learning of the union organizing activity, the company president gave a speech in which he informed employees of existing benefits, including the availability of interest free loans. See 301 N.L.R.B. at 513. For some employees, this was the first time they had heard of the availability of these loans, which were not mentioned in the printed statement of the company's benefits. See id. An ALJ found that, although these loans had been made in the past, the timing of the speech was "calculated to discourage employees' union activity, membership, and sympathy," and thus violated section 8(a)(1). Id. The NLRB rejected the ALJ's determination by holding:
 
 
 24
 The [NLRB] has recently reiterated that prohibiting an employer from publicizing existing benefits merely because employees had not previously been made aware of such benefits would deprive the employer of a legitimate campaign strategy.... Because the Respondent was referring to existing benefits, rather than granting or announcing new benefits, that reference does not in itself violate the Act.
 
 
 25
 Id. at 507 (quotation and citation omitted).
 
 
 26
 There is no dispute in this case that all the benefits at issue were benefits available to the employees well before any union activity. Consequently, the dissemination of information in the form of benefits summaries was a legitimate campaign strategy; it merely apprised Greenwood employees of the benefits available to them. See Raley's, Inc. v. NLRB, 703 F.2d 410, 415 (9th Cir.1983) ("The present case ... clearly falls under the protection of section 8(c), because Raley's announced benefits that were in place at the time."). Regardless of the possible effect on employee sentiment toward union representation, the circulation of the benefits summaries is protected conduct under section 8(c).
 
 
 27
 The NLRB distinguishes this case from Ideal Macaroni, finding the issuance of the benefits summaries in this case was not a legitimate campaign strategy, because Greenwood intentionally concealed information on existing benefits to save on labor costs. The information concealed was said to relate to the following benefits: bereavement leave; employee discounts for relatives; a guardian disability plan; jury duty compensation; marriage leave; paternity leave; stock purchase plan; tuition reimbursement; the DCAP; and the 401(k) plan. All of these benefits were in existence prior to the Union organizational activity. However, the NLRB considered the distribution of the summaries of these benefits as an announcement of new benefits, because it effectively constituted the "first general announcement" of these benefits. See Exchange Parts, 375 U.S. at 409-10, 84 S.Ct. at 460 (first general announcement of new system for computing overtime and an improved vacation schedule constituted an unfair labor practice). This proposition is insupportable. First, unlike Exchange Parts, there is no new or improved benefit at issue here. Second, in light of the reasoning in Ideal Macaroni, even if this is considered the first announcement of an existing benefit, it does not constitute an unfair labor practice simply because the existing benefits were announced prior to a Union election. The Greenwood employees, who first learned of existing benefits after the Union organizing campaign had begun, were not in a position different from the Ideal Macaroni employees, who did not learn of an existing informal loan program benefit until the union campaign was in progress.
 
 
 28
 Another distinction the NLRB attempts to draw between this case and Ideal Macaroni is that in this case there purportedly was an active effort by Greenwood to deny its employees information on available benefits. Even if there were such an active effort, the Act would not be violated unless the benefits were concealed as part of a strategy to announce them during a union election campaign. Cf. Pedro's Inc. v. NLRB, 652 F.2d 1005, 1008 (D.C.Cir.1981) ("[A] benefit granted in the normal course of the business of an employer, without any motive of inducing employees to vote against the union, does not violate the Act."). There is no evidence that the benefits here were strategically concealed with the purpose of revealing them during the Union organizational campaign. The evidence revealed, and the NLRB specifically found, that Greenwood concealed benefits from employees with the purpose of saving on labor costs.
 
 B. The Four Percent Raise
 
 29
 Greenwood contends that both the ALJ and the NLRB ignored overwhelming evidence that Greenwood's anti-union campaign manager, Jay Begley, never promised a wage increase. Greenwood further argues that even the testimony relied upon by both the ALJ and the NLRB does not establish that a promise was made. We disagree that the ALJ and the NLRB ignored evidence, but agree that the testimony relied upon by both the ALJ and the NLRB was insufficient to support a finding of an unlawful promise of a wage increase.
 
 
 30
 According to Pickus and Nelson, statements regarding a raise were made by Greenwood management personnel, including Begley, at a meeting of employees and management held shortly before the union election. The NLRB based its determination that Greenwood had made an implied promise of a wage increase solely upon the testimony of employees Pickus and Nelson. At the hearing, Pickus gave the following answers to the following questions:
 
 
 31
 Q. Okay, why don't you please tell us what happened at that meeting as best as you recall.
 
 
 32
 A.... There was also conversation at this meeting about a 4 percent increase, across-the-board increase.
 
 
 33
 Q. You're talking about a wage increase?
 
 
 34
 A. Right. There was a question ... Mr. Begley, looked at [Miller] and said isn't that right, and [Miller] said, "yes," and [Faria] said, "we're working on it." An employee, I don't remember who, ... responded[,] "Is that over and above our anniversary raise?" and the response back was, "yes it was."
 
 
 35
 Nelson's testimony essentially mirrored that of Pickus. The ALJ rejected the contradictory testimony, including that of management representatives Begley, Miller and Faria that no such raise was discussed. The ALJ stated that "[b]oth Pickus and Nelson appeared on the stand to be truthful witnesses, doing their best to give an accurate account of what happened. I discredit the denials."
 
 
 36
 Greenwood argues that the ALJ should not have relied on the testimony of Pickus and Nelson, while ignoring the testimony of Begley, Miller and Faria. However, the ALJ did not ignore the testimony of these witnesses; she simply did not find their testimony credible. Because the testimony of Pickus and Nelson is not "hopelessly incredible or ... flatly contradict[ed] either by the law of nature or undisputed documentary testimony" we will not disturb the ALJ's credibility determinations which were accepted by the NLRB. Kinney Drugs, Inc., 74 F.3d at 1427. (citation and quotation omitted).
 
 
 37
 Greenwood also contends that even if we credit Pickus' and Nelson's testimony, such testimony does not support the NLRB's finding that Greenwood had committed an unfair labor practice because Pickus and Nelson never testified that an actual promise was made.[3] A finding of an actual or express promise is not necessary as an implied promise can suffice to establish the necessary element of an unfair labor practice. See NLRB v. Windsor Indus., Inc., 730 F.2d 860, 864 (2d Cir.1984) ("Whether overt or implied, promises to employees in the midst of a Union campaign are unfair in that employees must not be lulled into believing that they can obtain benefits without the Union's aid."). Nonetheless, we believe that the NLRB's determination that Pickus' and Nelson's testimony provided sufficient evidence to support a finding that Greenwood implicitly promised a wage increase was erroneous.
 
 
 38
 A promise is "an undertaking however expressed that something will happen or not happen in the future." Webster's Third New International Dictionary 1815 (1981). In other words, a promise, whether express or implied, connotes a result or outcome that is certain. Here, the most that can be reasonably inferred from statements that the employer was "working on" a wage increase is that the wage increase was being considered or evaluated by management, not that the raise would definitely be granted in the future.
 
 
 39
 Moreover, to be considered unlawful, a promise of a wage increase must have been made to persuade employees that the increase could be obtained either without the Union's assistance, see Windsor Indus., 730 F.2d at 864, or only if the Union were rejected, see NLRB v. Rollins Telecasting, Inc., 494 F.2d 80, 84 (2d Cir.1974). The NLRB's determination that the implied promise was contingent on rejection of the Union by the employees is unfounded, given the credited testimony. There is no suggestion that the outcome of the Union election would affect management's decision concerning the wage increase. Certainly there was no suggestion that the wage increase could be obtained either without the Union's assistance or only if the Union were rejected.
 
 C. Solicitation of Grievance
 
 40
 Greenwood argues that the NLRB erred in finding that it illegally solicited a grievance, promised to rectify the problem, and actually rectified the problem, in violation of section 8(a)(1). An employer violates section 8(a)(1) if it solicits grievances during a union organizational campaign and promises to address those grievances if the union activity ceases. See HarperCollins, 79 F.3d at 1330. A pre-election solicitation of a grievance "is not a per se violation of § 8(a)(1) of the Act, but it is an unfair labor practice ... where the solicitation is accompanied by the employer's express or implied suggestion that the grievance will be resolved or acted upon only if the employees reject union representation." Torbitt & Castleman, Inc. v. NLRB, 123 F.3d 899, 907 (6th Cir.1997); see also Rollins, 494 F.2d at 83-84.
 
 
 41
 In the instant case, employee Garcia testified that Greenwood director of development Wilcox, referring to the union activity, asked, "[w]hat brought this on?" Garcia testified that she told Wilcox that it was the lack of knowledge of benefits among employees and the favoritism displayed in disseminating such information. According to Garcia, Wilcox then said "she would see what she could do." Within a few days, Wilcox presented Garcia with the first summary of existing benefits. The NLRB found that this inquiry by Wilcox and the subsequent provision of the benefits summary constituted an improper solicitation of a grievance because it was followed by a fulfilled promise to provide benefits information. The NLRB apparently concluded that the promise and its fulfillment were somehow conditioned on the rejection of the Union. We disagree with the NLRB's determination that the facts presented on this issue justified the conclusion that there was a violation of section 8(a)(1).
 
 
 42
 The benefits summary was provided prior to the election, and Greenwood clearly did not condition the conferral of either the benefits or the provision of the benefits summaries on the cessation of union activity by the employees. Indeed, having information on existing benefits in hand, the employees were perhaps in a better position to choose or reject the union.
 
 
 43
 Moreover, this is not a circumstance where, after inquiring as to what motivated the union activity, an employer learns that poor working conditions, low wages, or lack of benefits precipitated the activity. In those cases, any promise or remedial effort would have involved the provision of new or improved benefits, or better working conditions. Here, there was confusion concerning the existing benefits available to Greenwood employees. As we have noted, even though the discussion or publication of existing benefits might have some effect on an employee's decision to vote for or against union representation, it is a legitimate campaign strategy for an employer to comment on existing benefits. See Ideal Macaroni 301 N.L.R.B. at 507. Consequently, because the discussion between Wilcox and Garcia resulted in the imparting of information regarding existing benefits, protected speech under section 8(c) was implicated. See Selkirk Metalbestos, N.A. v. NLRB, 116 F.3d 782, 788 (5th Cir.1997) (holding that "Section 8(c) protects the right of an employer to make truthful statements of existing facts.").
 
 
 44
 If, as the NLRB found, Wilcox promised to provide, and did provide, information regarding existing benefits, the promise and fulfillment of the promise were not prohibited by the NLRA or by NLRB precedent. See e.g., Ideal Macaroni, 301 N.L.R.B. at 507. The fact that the information came in response to an employee's expression of concern after inquiry by the employer during a union organization campaign should make no difference. Restricting the publication of existing benefits information at any time would seriously handicap an employer's ability to fairly communicate benefits it has been willing to provide to its employees. See NLRB v. Pratt & Whitney Air Craft Div., United Technologies Corp., 789 F.2d 121, 134 (2d Cir.1986) ("Granting an employer the opportunity to communicate with its employees does more than affirm its right to freedom of speech; it also aids the workers by allowing them to make informed decisions....").
 
 CONCLUSION
 
 45
 In accordance with the foregoing, we deny the General Counsel's petition for enforcement and grant the petitioners' petition for review of the NLRB's order insofar as it directs Greenwood to cease and desist from (1) promising or granting benefits during a union organizing campaign, (2) promising an across-the-board wage increase during the Union organizing campaign and (3) soliciting complaints and promising relief during a union organizing campaign, and to post notices.
 
 
 46
 Under the circumstances presented here, this Court has no jurisdiction to set aside the portion of the order directing a new election, and we therefore decline the invitation to grant that relief. See 29 U.S.C. §§ 160(e) & (f); Boire v. Greyhound Corp., 376 U.S. 473, 476-77, 84 S.Ct. 894, 896-97, 11 L.Ed.2d 849 (1964); NLRB v. Monroe Tube Co., 545 F.2d 1320, 1329 (2d Cir.1976); cf. Goethe House N.Y., German Cultural Ctr. v. NLRB, 869 F.2d 75, 77 (2d Cir.1989).
 
 GRIESA, District Judge, concurring:
 
 47
 I concur in Judge Miner's opinion with the following comments.
 
 I.
 
 48
 Section A of the Discussion concludes with the statement that Greenwood concealed benefits from employees with the purpose of saving on labor costs. I wish to add that, whatever one thinks of this tactic, it occurred prior to the organizational campaign. The issue here is whether there was an unfair labor practice in connection with that campaign. Our holding is that the there was not. The statute surely does not require continued concealment of the facts.
 
 II.
 
 49
 My other comment relates to the question of remedy. The NLRB found that certain unfair labor practices tainted the representation election. It issued two kinds of directives. First, it directed that petitioner cease and desist from the unfair practices and that it post notices describing the NLRB findings and agreeing to refrain from such practices. Second, the NLRB directed that a second election be held.
 
 
 50
 The weight of authority in the judicial decisions is to the effect that the first directive constitutes a final order that can be reviewed by a court of appeals under § 10(f) of the NLRA, 29 U.S.C. § 160(f), but that the second is a non-final and non-reviewable order. This circuit has already ruled in accordance with this line of authority. NLRB v. Monroe Tube Co., 545 F.2d 1320 (2d Cir.1976); Bonwit Teller, Inc. v. NLRB, 197 F.2d 640, 642 n. 1 (2d Cir.1952). Other cases to the same effect include, e.g., NLRB v. Pizza Crust Co. of Penn., Inc., 862 F.2d 49, 50 (3d Cir.1988); Graham Architectural Products Corp. v. NLRB, 697 F.2d 534 (3d Cir.1983), reh'g en banc denied, 706 F.2d 441 (1983); NLRB v. Intertherm, Inc., 596 F.2d 267, 278 (8th Cir.1979); Raley's, Inc. v. NLRB, 725 F.2d 1204, 1205 (9th Cir.1984) (en banc). These circuit cases interpret both the statute and the following Supreme Court decisions as requiring such a ruling. Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); AFL v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940).
 
 
 51
 There is a serious practical problem in applying this rule. In cases such as the present one, the new representation election has been ordered by the NLRB solely because of a finding of unfair labor practices tainting the first election. Where a court of appeals strikes down the finding of unfair labor practices, this removes the only possible lawful basis for ordering a new election. However, according to the rule described above, the court of appeals cannot set aside the order of a new election concurrently with invalidating the finding of unfair labor practices.
 
 
 52
 There is a path to judicial review of the election order, although it is aptly described as "circuitous." If, after a ruling such as the one in the present case striking down the unfair labor practice findings, the NLRB should persist in ordering the new election, the employer would be required to allow such election. Should the union win and be certified as the bargaining representative, the employer could refuse to bargain with the union, thus bringing before the NLRB the question of whether such refusal is an unfair labor practice. If the NLRB enters an order against the employer on this ground, this would be a final order subject to court of appeals review under § 10(f). In seeking such review, the employer can raise any objections to the election, including the contention that the direction to hold the rerun was invalid. Graham, 697 F.2d at 543 n. 12.
 
 
 53
 However, there should surely be a solution short of this wasteful exercise. In this connection, a most useful reference is the Graham case decided by the Third Circuit. Following the panel decision, which declined to strike down the NLRB's order of a new election, the employer petitioned for rehearing en banc. Out of the ten judges hearing the petition, four voted to grant rehearing, taking the view that the ordained procedure to obtain review of the election order is an extended and expensive exercise serving no useful purpose. Graham Architectural Products Corp. v. NLRB, 706 F.2d 441, 442 (3d Cir.1983). Two other judges, although they were unwilling to vote for rehearing, responded to the employer's objection to an "unnecessary" election.
 
 
 54
 ... we are simply declining to review an interlocutory election order, in accordance with the statutory scheme enacted by Congress. We expect that the Board will now proceed to reconsider its election order in light of our holdings on the unfair labor practices, and if the election is indeed "unnecessary" the Board no doubt will vacate the election order.... This fear that the Board may act irrationally and arbitrarily is not a sound basis for us to interfere with the Board's primary authority in election matters and exercise jurisdiction over an interlocutory order.
 
 
 55
 706 F.2d at 441.
 
 
 56
 I believe that the above comment is eminently sound. Since the election order in the present case is non-final, it is still before the NLRB for appropriate action, including cancellation. I assume that the NLRB will view the matter fairly in light of the fact that the basis for the order of a new election--i.e., the finding of unfair labor practices--has been taken away.
 
 LEVAL, Circuit Judge, dissenting:
 
 57
 I respectfully dissent from the majority's conclusion that the revelation of previously concealed benefits to influence the union election was not a violation of the Act.
 
 
 58
 The Board found on evidence whose sufficiency the majority acknowledges that Beverly initially concealed benefits from its employees in order to save money and later revealed those benefits for the purpose of influencing the union election. The Board concluded that such conduct was essentially similar to the granting or promising of new benefits for the purpose of influencing a union election, which has repeatedly been held to violate the Act. See, e.g., Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); HarperCollins, 79 F.3d 1324 (2d Cir.1996). I believe the Board was well within its power in so ruling.
 
 
 59
 The majority contends the Board was wrong and that this position follows from the Board's ruling in Ideal Macaroni Co., 301 N.L.R.B. 507 (1991), that the publicizing of existing benefits to influence a union election is not a violation, even if employees were not previously aware of them.
 
 
 60
 This case is different from Ideal Macaroni. In Ideal there had been no effort to conceal the benefits, and no misconduct; all the employer had done was to publicize benefits made available to certain employees in good faith. Here, in contrast, the employer's conduct was manipulative. The benefits were deliberately concealed and would have remained so, but for the manipulative decision to reveal them so as to influence the election. I can see no useful difference between granting new benefits and revealing benefits previously concealed when both are done in order to influence a union election. For an employer to adopt but conceal a benefits program and then to reveal the concealed benefits has all the undesirable qualities of promising new benefits to influence the election, plus dishonesty to boot.
 
 
 61
 I can see no reason why we should not accept the Board's reasonable conclusion that the facts shown here violate the Act.
 
 
 
 *
 The Honorable Thomas P. Griesa, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Miller had been employed at Greenwood in 1988, but worked elsewhere until her return to Greenwood in 1989. She served as Greenwood's administrator at all times relevant to this appeal
 
 
 [2]
 Following the General Counsel's discovery that Greenwood had been giving employees a 3-week vacation after 3 years of employment, the General Counsel withdrew the allegation that Greenwood had promised and granted improved vacation benefits during the Union campaign
 
 
 [3]
 Greenwood argues further that Pickus' testimony was her subjective interpretation of what took place at the meeting. However, Pickus' testimony went well beyond her subjective impressions and included direct quotations of statements made by Begley, Faria, and Miller. Cf. NLRB v. Semco Printing Ctr., Inc., 721 F.2d 886, 890 (2d Cir.1983) (holding that where witness has put precise language in doubt, the trier of fact is entitled to consider all of the witness' recollections)